IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

WILBERT R. BOGGS,

      Plaintiff,

v.                                CASE NO. 2:08-cv-00100

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Wilbert R. Boggs (hereinafter referred to as "Claimant"), filed an application for DIB on March 21, 2005, alleging disability as of January 1, 2002, due to an inability to read and write well, and back pain. (Tr. at 13, 49-51, 67-73.) The claim was denied initially and upon reconsideration. (Tr. at 13, 35-37, 41-43.) On April 28, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 44.) The

hearing was held on January 9, 2007 before the Honorable Theodore Burock.  (Tr. at 27, 245-271.)  By decision dated March 20, 2007, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 13-26.)  The ALJ's decision became the final decision of the Commissioner on January 8, 2007, when the Appeals Council denied Claimant's request for review.  (Tr. at 5-8.)  On February 12, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  <u>See</u> <u>Blalock v. Richardson</u>, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  <u>Id.</u> § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  <u>Id.</u> § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  <u>Id.</u> § 404.1520(c).  If a severe

impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.   Id.   If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.   Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 15.) Under the second inquiry, the ALJ found that Claimant suffers

3

from the severe impairments of low back syndrome and borderline intellectual functioning when the complaints are considered singly. (Tr. at 15-16.)   At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 16-20.)  The ALJ then found that Claimant has a residual functional capacity for medium work, reduced by nonexertional limitations.   (Tr. at 20-24.)   As a result, Claimant cannot return to his past relevant work.  (Tr. at 24.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as laundry worker and janitor, which exist in significant numbers in the national economy.  (Tr. at 24-25.)  On this basis, benefits were denied.  (Tr. at 25-26.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Cellebreze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is not supported by substantial evidence.

Claimant's Background

Claimant was 53 years old at the time of the administrative hearing.  (Tr. at 249.)  He has an eighth grade education with special education classes.  (Tr. at 251-53.)  In the past, he worked as a union general laborer in the construction industry for twenty-two years; prior to that employment, he worked on a farm, in a steel foundry, and in a door and window factory.  (Tr. at 77, 252, 254, 263-64.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record.  Claimant's challenge relates exclusively to the ALJ's treatment of his mental impairments, specifically his level of intellectual functioning.  As a result, the court will primarily summarize the evidence related to Claimant's level of intellectual functioning.

Intellectual Functioning Evidence

Claimant completed the eighth grade with mostly C's and D's, throughout the school records. (Tr. at 128.) Claimant testified that he repeated the first and seventh grades and withdrew in the ninth grade at age 16. (Tr. at 252.) Claimant testified on January 9, 2007, that he was in special education classes. (Tr. at 253.) The court notes the public school record does not note a special education designation. (Tr. at 128.)

Claimant's public school records indicate he was absent twenty-five days in third grade, two days in fourth grade, twenty-five days in fifth grade, thirty-four days in sixth grade (tardy for seventy-four days), thirty-five days in seventh grade, and twenty-eight days in the year he repeated seventh grade. (Tr. at 128.) School records for first, second, eighth grade and ninth grade are not available. (Tr. at 128.) Claimant was absent on the dates standardized testing occurred in fourth and seventh grades. (Tr. at 128.) However, a test labeled "Otis 10-65" indicates Claimant's IQ to be 70. (Tr. at 128.) He testified that some of his absences were due to working on his family farm and working for other area farmers. (Tr. at 252.)

Claimant testified that he has a driver's license and took a written test, which he passed on "probably" the third time. (Tr. at 253.) He further testified that he can read and write "a little bit." (Tr. at 253.) He also testified that he can communicate in

writing and reading when "small words" are used. (Tr. at 253-54.)

On April 24, 2005, Lisa C. Tate, a licensed psychologist, provided a psychological evaluation at the request of the West Virginia Disability Determination Service. (Tr. at 130-35.) She stated that Claimant reported no history of mental health treatment. (Tr. at 131.) She found Claimant was alert throughout the evaluation; oriented to person, place, and time; his mood was euthymic; his affect was broad and reactive; his thought processes appeared logical and coherent; his insight was fair and judgment was normal; his immediate memory and remote memory were within normal limits; his recent memory was moderately deficient. (Tr. at 132.)

Ms. Tate administered Claimant the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), upon which he scored a 68 verbal IQ score, a 64 performance IQ score, and a 64 full scale IQ. (Tr. at 132-33.) Ms. Tate deferred her diagnostic assessment due to invalid test results. (Tr. at 134.) She found:

> WAIS-III VALIDITY: The results of the WAIS-III are considered invalid based on the above presented factors. Rapport was not established to a satisfactory degree. He maintained a consistent level of effort but was consistently slow at performing tasks. He required constant encouragement. He worked at a slow pace. His mood had a mild negative effect on performance. He has a driver's license and drives. He once worked out of the labor union for a total of twenty-three years and has also been a molder in a steel foundry for six-and-a-half years, factory worker and farm worker.

```
WRAT-III
Subject              Standard Score      Grade Equivalent
Reading                   58                    3
Spelling                  47                    1
Arithmetic                48                    2
```
Results from the WRAT-III are considered invalid based on the above presented factors.

(Tr. at 133.)

Ms. Tate opined Claimant's social functioning was within normal limits based on his interaction with staff during the evaluation, and his concentration and persistence were mildly deficient based on clinical observation and his ability to calculate serial threes. His pace was found to be moderately deficient based on clinical observation. (Tr. at 134.) She found he appeared competent to manage any benefits he may receive. (Tr. at 134.)

On May 25, 2005, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant had no medically determinable impairment. (Tr. at 151.) The evaluator, Clark H. Hoback, M.D. opined: "Claimant alleges unable to read or write well. He has no history mental health treatment. He was scheduled for CE. Claimant is not entirely credible. His effort was variable and the results were invalid. His adaptive function does not suggest mental retardation. Claimant has no medically determinable psychiatric impairment." (Tr. at 163.)

On July 19, 2005, Claimant had a psychological evaluation by Timothy S. Saar, Ph.D., a licensed psychologist, and Janice Blake,

8

M.A., a supervised psychologist, at the request of Claimant's representative. (Tr. at 184-92.) They reported that Claimant denied any issues with mental health and had special education classes from fourth to eighth grades. (Tr. at 185.) They found Claimant was dressed appropriately; speech was relevant and coherent; psychomotor activity was within normal limits; anxiety level was appropriate to the situation, "constricted range of affect with mood observed (first hostile then euthymic)" stream of thought "logical, sequential, and coherent"; and no evidence of excessive obsessions, compulsions, or phobias, hallucinations or delusions, homicidal/suicidal ideations; immediate memory intact but delayed memory was impaired. (Tr. at 186.) They concluded that "[e]stimated intelligence appeared below the average range of intellectual functioning." (Tr. at 186.)

Evaluators Saar and Blake found:

> Rapport was not easily established with the client, who was uncooperative and at times hostile when questioned concerning specific job duties and difficulties in education. It appeared that he was trying to cover up his slow learning and lack of achievement in the workplace. After a time, rapport was established with the client giving details related to his seasonal work in the labor union which consisted of work that lasted three to six months and was very menial.

(Tr. at 186.)

Evaluators Saar and Blake administered Claimant the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), upon which he scored a 67 verbal IQ score, a 60 performance IQ score, and a 62

9

full scale IQ.  (Tr. at 187-88.)  They found the claimant put forth a good effort and that the scores correlated with those found for the Disability Determination dated April 12, 2005.  (Tr. at 187.) Regarding the WRAT-3 assessment tool, they found:

| Subtest | Standard Score | Grade Equivalent |
|---------|----------------|------------------|
| Reading | 62 | 3rd |
| Spelling | 59 | 3rd |
| Arithmetic | 56 | 2nd |

These scores are considered valid for the same reasons the IQ scores are considered valid.  Again, scores correlate with those on his previous evaluation...

(Tr. at 187-88.)

Evaluators Saar and Blake made an Axis II diagnosis of mild mental retardation and an Axis V diagnosis of Global Assessment of Functioning ("GAF") of 55[1].  They concluded:

The client's test results are consistent with those achieved during prior testing.  During that evaluation, it was believed that test results were invalid due to client's hostility, however, when current test results correlated with those achieved previously, the client was re-interviewed to further assess his work history as it did not appear that an individual with his obtained scores could work for twenty-three years in a labor union, nor could he perform satisfactorily for six and one-half years as a molder in a steel factory.  When questioned, not allowing the client to be evasive, he initially was hostile which appeared to be an attempt to cover up the fact that he had performed very menial tasks during this period of time in his work.  It took fairly intense questioning to get him to report that he had been a seasonal worker and basically his duties were to get

---

[1]  The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100.  A GAF of 51-60 indicates that the person has "[m]oderate symptoms...or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

10

> the tools or products that the carpenters needed to
> perform their jobs.  He also reported filling sand
> bags... He in fact, did not work as a molder, but had
> worked as an individual who held the slag back to keep it
> from getting into the casting... He fully denied any
> mental health symptoms, however, his drawing on the H-T-P
> [House-Tree-Person] was consistent with an individual
> with very low self-esteem.  It also correlated with an
> individual who functions within the mild mental
> retardation range of intellectual functioning.

(Tr. at 188-89.)

On February 16, 2006, a State agency medical source completed a Mental Residual Functional Capacity Assessment and opined that Claimant was not significantly limited in most areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (Tr. at 202-04.)  The limitations found were moderate limitation in the ability to maintain attention and concentration for extended periods, and marked limitation in the ability to understand and remember detailed instructions and carry out detailed instructions. (Tr. at 202.)  The evaluator, Frank Roman, a licensed clinical psychologist, opined:

> Limitations are noted in part one of residual functional
> capacity  which pose a moderate restriction in the CPP
> [concentration, persistence, pace] domain. He has a good
> work history - twenty-three years in construction and as
> a truck driver.  He quit due to LBP [low back pain].  He
> is independent in his ADLs [activities of daily living].
> He has no other psych [psychiatric] history.  Based on
> MER [medical evidence review] he is independent in ADLs
> and able to follow routine work activities with initial
> supervision.

(Tr. at 204.)

11

On February 16, 2006, a State agency medical source completed a Psychiatric Review Technique form and found a Residual Functional Capacity Assessment was necessary due to a 12.05 Mental Retardation categorization. (Tr. at 206.) The evaluator, Mr. Roman, found Claimant had a mild degree of limitation in restrictions of activities of daily living and in maintaining social functioning. He found a moderate degree of limitation in maintaining concentration, persistence, or pace. He found no episodes of decompensation. (Tr. at 216.) Dr. Roman concluded: "Based on MER [medical evidence review] claimant is partially credible. He worked twenty-three years in construction and quit due to LBP [low back pain]. He has his drivers license and although he has difficulty reading and writing, he functions well into the kBIF (sic) ["k" appears to be a typo; "BIF" means borderline intellectual functioning[2]] range." (Tr. at 218.)

---

[2] "Diagnosing Borderline Intellectual Functioning (BIF) is complicated, as the condition is subtle and difficult to detect. BIF may also be accompanied by co-morbid disorders, which further complicate diagnosis. BIF often escapes detection until affected individuals reach school age, specifically when academic demands are placed on affected children. As is the case with mental retardation, the diagnosis of borderline intellectual functioning is made with a combination of academic achievement tests, intelligence quotient (IQ) screening, and adaptive functioning assessments. The tests are weighed in collaboration with observations made by assessors, school staff, and children's primary caretakers. The IQ range appropriate for the diagnosis of borderline intellectual functioning is between 71 and 84. About 7 percent of the population falls within this range of intellectual functioning." Tammi Reynolds, BA & Mark Dombeck, Ph.D.; http://resources.atcmhmr.com/poc/view_doc.php?type=doc&id=10348, last checked February 23, 2009.

Physical Evidence of Note

On May 4, 2005, Miraflor G. Khorshad, M.D., examined Claimant at the request of the West Virginia Disability Determination Service. (Tr. at 136-40.) Dr. Khorshad diagnosed low back syndrome. (Tr. at 138.) He found Claimant had normal upper extremity strength, grip strength, fine manipulation, lower extremity muscle strength, and good effort. (Tr. at 139-40.)

On May 17, 2005, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform heavy work with an ability to frequently climb ramps/stairs, stoop, kneel, crouch and crawl, and an occasional ability to climb ladder/rope/scaffolds and balance, with no manipulative, visual, communicative, or environmental limitations. (Tr. at 141-145.) The evaluator, Marcel G. Lambrechts, M.D., opined:

> This claimant complains of back pain and has had it for a while but has not sought treatment as he cannot afford it. He also complains of headaches and occasional stiff neck. His physical CE [consultative evaluation] was not too impressive. He did walk with a slight limp only. I do not believe that he has a severe impairment. I did not reduce his residual functional capacity as I feel that it is not a severe problem and that his symptoms were magnified.

(Tr. at 146.)

On February 3, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work with no postural limitations, no

manipulative, visual, communicative, or environmental limitations. (Tr. at 193-97.)  The evaluator, Thomas Lauderman, M.D., opined "This claimant is partially credible.  Takes Aleve for back pain, sometimes wears a back brace.  Sometimes he can walk a mile and sometimes he feels like he can't walk at all.  He shops and visits relatives." (Tr. at 198.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ did not find Claimant suffers from a 20 C.F.R., Part 404, Subpart P, Appendix 1, §12.05 impairment.  (Pl.'s Br. at  7-18.)

The Commissioner argues that the ALJ's decision is supported by the substantial evidence because the ALJ properly assessed the evidence and Claimant's credibility in finding Claimant's intellectual functioning did not meet or equal the criteria of Listing 12.05C.  (Def.'s Br. at 9-16.)

<u>Listing 12.05C</u>

Claimant argues that the ALJ erred in failing to find that he meets or equals Listing 12.05C, mental retardation.  Claimant first asserts that the ALJ did not make a fair evaluation of the medical evidence and misquoted it several times.  (Pl.'s Br. at 9-12.) Claimant next asserts the ALJ did not fairly evaluate his school records which show he suffered from deficits in adaptive functioning, which first manifested before age 22.  (Pl.'s Br. at

14

13-15.)  Claimant further asserts that the ALJ erred in relying on his work experience to conclude Claimant did not suffer deficits of adaptive functioning which manifested before age 22.  (Pl.'s Br. at 15-18.)

Evaluation of Medical Evidence/IQ Testing

Claimant first asserts the ALJ did not make a fair evaluation of the medical evidence and misquoted it several times in a manner so as to support his conclusion that Claimant did not meet Listing 12.05C.  Claimant argues:

> Most significantly, Judge Burock indicated that Lisa Tate diagnosed Mr. Boggs with borderline intellectual functioning... The record clearly shows that no examining psychologist diagnosed Mr. Boggs with borderline intellectual functioning.  Ms. Tate did not diagnose Mr. Boggs with borderline intellectual functioning.  Instead, she indicated that her diagnosis was deferred because she believed that the psychometric testing performed on Mr. Boggs was invalid.

(Pl.'s Br. at  9-10.)

In order to meet the criteria of Listing 12.05C, the regulations require that Claimant must meet the introductory language of Listing 12.05C, which states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Subpt. P, App. 1, § 12.05 (2006); see also § 12.00A (stating that for Listing 12.05, Claimants must satisfy the diagnostic description in

15

the introductory paragraph and any one of the four sets of criteria).   Listing 12.05C also requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2006).

The Fourth Circuit has held that a Claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C.  Luckey v. Bowen, 890 F.2d 666 (4th Cir. 1989).  A "severe" impairment is one "which significantly limits [one's] ability to do basic work activities." 20 C.F.R. § 404.1520(c) (2006).  In Luckey, the Court ruled that

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of § 12.05C.   Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities.  The Secretary's finding that Luckey suffers from a severe combination of impairments also establishes the second prong of § 12.05C.

Id. at 669.

In his decision, the ALJ determined that Claimant did not suffer from a severe mental impairment. The ALJ found as follows:

> Pursuant to his claim for disability benefits the claimant was individually administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) during two psychological examinations.   He earned verbal, performance, and full scale IQs of 68, 64, and 64 respectively, in April 2005 and 67, 60, and 62 respectively, in July 2005.  The claimant argues that, considering his low back syndrome, he meets the criteria

16

of subsection C of section 12.05, mental retardation. Section 12.05C requires a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. But section 12.05 sets forth a threshold definition of mental retardation that is, significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairment before age 22. The medical and other evidence does not show that the claimant satisfies the diagnostic criteria for mental retardation.

Based on a consultative psychological examination in April 2005, Lisa Tate, M.A., licensed psychologist, diagnosed Borderline Intellectual Functioning (Exhibit 1F). Ms. Tate opined that the IQs obtained at the consultative examination were not valid based on both internal and external factors of validity. Based on an attorney-referred examination in July 2005, Janice Blake, M.A., supervised psychologist, and Timothy S. Saar, Ph.D., licensed psychologist, diagnosed Mild Mental Retardation (Exhibit 7F). The State agency psychological consultant upon reconsideration, Frank D. Roman, a licensed clinical psychologist, made a somewhat equivocal assessment, identifying Mental Retardation under section 12.05, but opining that the claimant "functions well into the kBIF (sic) range" (Exhibit 10F). The undersigned accepts Ms. Tate's diagnosis, which is well supported by the medical and other evidence.

(Tr. at 16-17.)

Claimant correctly notes that the ALJ's assertion that Ms. Tate diagnosed Claimant with borderline intellectual functioning is erroneous. Ms. Tate unequivocally deferred her diagnosis because she determined the psychometric testing performed on Claimant was invalid due to evidence of Claimant high level of functioning in work, social, and daily activities. (Tr. at 133.) The only evaluator to discuss borderline intellectual functioning was non-

17

examining clinical psychologist, Frank D. Roman, who actually indicated in his review of the evidence that under 12.05, Claimant was diagnosed as mentally retarded.  (Tr. at 210.) However, in his comments he stated Claimant "functions well into the kBIF range (sic)."  (Tr. at 218.)

Claimant also asserts the ALJ misquoted Ms. Tate's report and Ms. Blake's reports.  Specifically at issue is Ms. Blake's statement "During *that* (emphasis added) evaluation, it was believed that the test results were invalid due to the client's hostility." (Tr. at 189, Pl.'s Br. at  11-12.) Claimant states that contrary to the ALJ's discussion,

> "that evaluation" refers to the Tate evaluation, not the Blake evaluation.  Furthermore, Judge Burock ignored the balance of the sentence which explained that Ms. Blake and Dr. Saar reinterviewed and more thoroughly investigated Mr. Boggs' work history to determine whether the IQ scores they had found were valid.  The ALJ has basically turned Ms. Blake's report on its head in an effort to show that the scores were not valid.

(Pl.'s Br. at  12.)

Claimant correctly notes that the ALJ does appear to be confusing the evaluation of Ms. Tate with the evaluation done by Ms. Blake and Dr. Saar.  (Tr. at 17.)  However, it is also noted that the Blake/Saar report is misstating Ms. Tate's report when it states in referring to Ms. Tate's report:  "During that evaluation, it was believed that the test results were invalid due to the client's hostility."  (Tr. at 189.) Ms. Blake and Dr. Saar seem to infer that Ms. Tate found the claimant hostile, while it appears

18

that this is solely their impression of Claimant. There is no
indication in Ms. Tate's report that she made such a finding.
Rather Ms. Tate found the IQ testing invalid because Claimant's
obtained scores did not comport with his work history, social
functioning, and daily activities. (Tr. at 133-34.)

Claimant further asserts the ALJ misstated Ms. Tate's report
when he reported that the evaluator opined that Claimant's "mood
had a negative effect on his performance." (Pl.'s Br. at 11, Tr.
at 17.) Claimant states that the actual language of Ms. Tate's
report was that Claimant's "mood had a mild negative effect on his
performance." (Pl.'s Br. at 11, Tr. at 133.) Claimant argues:
"While mild may be an imprecise term in evaluating the medical
evidence, the ALJ's failure to include this descriptive term in his
quotation from Ms. Tate's report suggests that Judge Burock's
analysis of the evidence was colored by a desire to deny the
claim." (Pl.'s Br. at 11.)

The undersigned finds that the ALJ did misstate the medical
evidence in the three instances outlined above, and that these
misstatements undermine the credibility of his decision.

Accordingly, with respect to Claimant's argument that the ALJ
did not make a fair evaluation of the medical evidence and
misquoted it several times, the court proposes that the presiding
District Judge find that the ALJ improperly assessed the medical
evidence/IQ testing and that there is no dispute that Claimant's IQ

19

scores of 67/60/62 from Ms. Blake's/Dr. Saar's evaluation meet the Listing 12.05C which requires "[a] valid verbal, performance, or full scale IQ of 60 through 70."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2006).

School Records/Deficits of Adaptive Functioning Before Age 22

Claimant next takes issue with the ALJ's consideration of his school records, contending his evaluation is "full of inconsistencies and assumptions not supported by the record." (Pl.'s Br. at  13-15.)

The ALJ considered Claimant's school records and reached this conclusion:

> The only other IQ of record appears on the claimant's school transcript (Exhibit 11E).  The claimant earned a full-scale IQ of 70; he was 12 years old.  IQs obtained prior to age 16 are not reliable indicators of life-long functioning.  IQs above 40 obtained at or after age seven are considered current for approximately two years. (DI24515.055)  Moreover, given a measurement of error of approximately five points, a measured IQ of 70 is considered to represent a true IQ in the range of 65 to 75.  Hence, the need for significant deficits in adaptive functioning initially manifested during the developmental years in order to make a diagnosis of Mental Retardation.

(Tr. at 17.)

Later in his decision, the ALJ states:  "There is no evidence of change in the claimant's life-long intellectual functioning, and he has performed competitive public employment his whole life." (Tr. at 22.)

Claimant argues that the ALJ "cannot have it both ways. Either the IQ score of 70 achieved when he was twelve was only

20

current two years or there has been no change in his lifelong intellectual functioning." (Pl.'s Br. at 14.) Claimant notes that three different testings of Claimant reported IQ scores in 70 range or below and that the Tate exam and Blake/Saar exam took place within three months. (Pl.'s Br. at 13.)

The ALJ considered the school records but found they did not support a diagnosis of mental retardation with the requisite deficits in adaptive functioning. The ALJ noted that Claimant received his driver's license by written test after his third attempt. (Tr. at 13, 253.) However, the ALJ also noted that Claimant's educational abilities were consistent with a "marginal education (which) generally denotes the reasoning, arithmetic, and language skills to do simple unskilled work. But the claimant has a vocational history in semiskilled occupations that call on performance skills." (Tr. at 19.)

The undersigned finds the ALJ's analysis unconvincing. The court finds that the claimant's life-long intellectual functioning has been mentally retarded. Claimant has established this through Listing § 12.05, which sets forth a threshold definition of mental retardation that is, significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairment before age 22. The evidence shows Claimant was in special education classes,

achieved mostly C's and D's, repeated two grades, and tested with an IQ score of 70 in the seventh grade. The court notes the IQ testing was an Otis test, rather than a Wechsler test. Therefore, the results cannot be the basis for finding Claimant suffers from an impairment that meets § 12.05C, 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00D(6)(c)(2007). However, the existence of this evidence during Claimant's developmental period tends to support the conclusion of the later testing, which concludes Claimant's intellectual deficits were the result of mental retardation.

Accordingly, with respect to Claimant's argument that the ALJ did not make a fair evaluation of the record related to Claimant's evidence of adaptive functioning during his developmental years, the court proposes that the presiding District Judge find that the ALJ improperly assessed the school record evidence and that this evidence, when combined with later IQ testing, shows Claimant's significant deficits in adaptive functioning that initially manifested during his developmental years and warrants a diagnosis of mental retardation.

Work Experience/Deficits in Adaptive Functioning Before Age 22

Claimant next asserts that the ALJ erred in relying on his work experience to conclude Claimant did not suffer deficits of adaptive functioning which manifested before age 22. (Pl.'s Br. at 15-18.) Claimant asserts: "People suffering from mild mental retardation can work. Therefore, Mr. Boggs' ability to work in the

22

past should not disqualify him from disability benefits if he
suffers from a condition which meets the Commissioner's Listing of
Impairments at...§ 12.05C." (Pl.'s Reply Br. at 1.) Further,
citing Luckey, Claimant asserts that the Commissioner "may not
rely on previous work history to prove nondisability where the §
12.05C criteria are met." (Pl.'s Reply Br. at 3.)

The Commissioner argues, relying on Craig v. Chater, 76 F.2d
585 (4th Cir. 1996), that Claimant must prove his intellectual
capacity has deteriorated since he held his past jobs. (Def.'s Br.
at 13.)

> Claimant retorts that he
>
> is not required to prove that his intellect has
> deteriorated since he worked in order to meet § 12.05C.
> Instead, he is required to prove that he now suffers from
> a severe impairment other than mild mental retardation.
> Given that the ALJ concluded that Mr. Boggs could no
> longer perform his past relevant work due to severe back
> impairment, (Tr. 14, Finding No. 6), he has made that
> showing.

(Pl.'s Reply Br. at 5.)

> In regard to Claimant's work experience, the ALJ found:
>
> The record does not support significant deficits in work.
> The claimant reports having worked as a construction
> laborer during the past fifteen years. He worked
> seasonally for many years. Seasonal work is not
> inconsistent with work that is done outdoors and goes to
> the amount of work done rather than the degree of
> responsibility involved. The claimant describes his work
> activity as consisting of very simple tasks, such as
> filling sand bags. But more than fifteen years ago the
> claimant worked for six and one-half years as a molder in
> a steel foundry. When discussing this job with Ms. Blake
> and Dr. Saar, the claimant denied having performed all of
> the functions of the job; he said that he just held the

23

slag back to keep it from getting into the castings.  The subject of the nature of that job resurfaced during the hearing.  The claimant testified that he operated a machine to make sand molds used to form castings.  This is the description of the occupation of a foundry Machine Molder, a semi-skilled occupation with a SVP (Specific Vocational Preparation rating) of 4 (Dictionary of Occupational Titles (DOT) 518.682-010).  The claimant also testified that he operated an overhead electric crane that ran on one track, used to lift and move materials in the foundry.  This is the description of a foundry Charging Crane Operator II, semi-skilled occupation with a SVP of 4 (DOT 921.663-042)... The evidence suggests that the claimant's reluctance to describe his job tasks in detail at the attorney-referred evaluation may have been motivated by a desire to minimize or underestimate his responsibilities...

The claimant's vocational history argues against significant deficits in communication as well as work. The claimant denies unsatisfactory performance.  He says he gets along very well with authority figures.  The claimant does not report any difficulty getting along with others when he was in school.  He consistently received average grades ("C"s) in courtesy, self-control and reliability.  His grades fell to below average ("D"s) in industry, punctuality, and cooperation. (Exhibit 11E) Ms. Tate opined that the claimant's social functioning during her examination was within normal limits.  The uncooperativeness and hostility that the claimant initially displayed at the Blake-Saar evaluation reportedly resolved during the second interview. (Exhibits 1F, 7F)  The claimant may be mildly limited in social functioning when he is under stress.  (Exhibit 11E)  The claimant was married for fourteen years and has two children.  He has been involved in the same romantic relationship for 12 years or more.  The claimant has friends.  He socializes on the phone and visits friends and relatives regularly.

The claimant does not exhibit significant deficits in self-care, home living, self-direction, health, safety, or the use of community resources.  He dresses appropriately and maintains good grooming and hygiene. He is independent in the conduct of his daily activities. The claimant has been able to live independently with his wife or significant other since his twenties.  He and his girlfriend share cooking, household chores, and yard

24

work.  He seeks medical attention when needed.  His work history on construction sites argues against inability to appreciate ordinary hazards.  The claimant was a member of a labor union for many years and abided by its hiring and work rules.  The claimant does not exhibit significant deficits in adaptive functioning initially manifested during the development period that would support a diagnosis of mental retardation.

The severity of subaverage intellectual functioning that does not meet the diagnostic criteria for mental retardation is evaluated under subsection D of § 12.05 according to the degree of the claimant's functional limitation in four areas - activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decomposition (20 C.F.R. 404.1520a). Since the claimant does not have at least marked restriction of in two of the first three areas or marked restriction in one of the first three areas and repeated episodes of decomposition, each of extended duration, the severity of his intellectual deficit does not meet the criteria of § 12.05.

(Tr. at 18-19.)

The undersigned notes that the ALJ found Claimant was only partially credible, yet he chose to believe what were clearly misstatements of Claimant's work history and adaptive functioning abilities.  The court notes that the Work History Report - Form SSA-3369 clearly denotes Claimant's employment as a general laborer in the construction field from 1979 through 2001.  Further, Claimant's pay records are not reflective of semi-skilled employment.  (Tr. at 59-66.)  It is further noted that Claimant testified that when he worked in the steel foundry, that he worked with two older brothers, which tends to show Claimant's level of adaptive functioning was due to a strong support system.  (Tr. at 264.)  The court finds that the evidence shows Claimant's work

25

history was comprised entirely of menial labor jobs and that Claimant's inflated descriptions of his jobs during his testimony were a product of his embarrassment regarding the servile nature of his work.

Accordingly, with respect to Claimant's argument that the ALJ did not make a fair evaluation of the vocational evidence, the court proposes that the presiding District Judge find that the ALJ improperly assessed Claimant's work experience and that Claimant has shown that his mental retardation caused significant work-related limitations of function pursuant to 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05C.

Based on the foregoing, the undersigned recommends that the presiding District Judge reverse the Commissioner and find that Claimant meets the Listing 12.05C.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding Chief District Judge REVERSE the final decision of the Commissioner, REMAND this case for determination of the date of onset of disability and the computation of past due benefits, and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Joseph R. Goodwin. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and

72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

<u>      February 26, 2009      </u>
        Date

                                    *Mary E. Stanley*
                                    Mary E. Stanley
                                    United States Magistrate Judge